[Cite as *Smith v. Smith*, 2023-Ohio-982.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |  |
|---|---|---|---|
| PETER J. SMITH, | : | | |
| Appellant, | : | | CASE NO. CA2021-09-109 |
| - vs - | : | | O P I N I O N<br>3/27/2023 |
| | : | | |
| REBECCA SMITH, | : | | |
| Appellee. | : | | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DR 20 02 0132

Dinsmore & Shohl LLP, and Timothy A. Tepe, for appellant.

Smith, Meier & Webb, LPA, and Mark D. Webb, for appellee.

**BYRNE, J.**

{¶1}   Peter Smith appeals from the decision of the Butler County Court of Common Pleas, Domestic Relations Division, which terminated his marriage to Rebecca ("Becca") Smith and ordered a division of property.  For the reasons discussed below, we affirm the decision of the domestic relations court.

**I. Procedural and Factual Background**

{¶2}   Peter and Becca married in 2014.  The marriage produced one daughter, born

in 2017. In February 2020, Peter filed for divorce.

{¶3} The divorce proceedings led to a contested hearing. The issues at the hearing involved disputes over shared parenting, valuation of real estate, and two financial accounts that Peter claimed were funded either entirely, or mostly, through his separate property. This appeal relates solely to that separate property claim.

**A. The Contested Hearing**

{¶4} Peter and Becca testified at the hearing. The parties also introduced and discussed numerous financial documents, including but not limited to records of checking and savings account statements throughout the marriage. The following is a summary of the relevant evidence produced at the hearing.

{¶5} Peter and Becca both worked during the marriage, though Peter earned more money than Becca. Peter managed the family finances and paid the bills. Every month or two, Peter would tell Becca to write him a check from her separate checking account for her share of the family expenses. Throughout the marriage, the parties routinely spent more money each month than they earned.

{¶6} During the marriage, Peter had a checking account and a savings account, both of which were held in his name only ("the checking account" and "the savings account"). Peter's employer regularly deposited his paycheck into the checking account. Peter would deposit Becca's check for her share of the monthly expenses into the checking account as well. The family had no other regular sources of income.

{¶7} Peter used the checking account to pay the family's monthly expenses. With the deposit of each paycheck, Peter transferred $50 or $150 from the checking account to the savings account. Prior to the inheritance discussed below, the savings account's balance was approximately $1,700.

{¶8} In March 2015, the Edward Jones Trust Company informed Peter that he

would be receiving distributions from the trust of his deceased great-aunt. Between May 2015 and June 2016, the trust company paid Peter three distributions,[1] as follows:

| Distribution amount | Deposit Date |
|---|---|
| $25,000 | May 1, 2015 |
| $100,000 | December 4, 2015 |
| $106,887 | May 24, 2016. |
| Total:  $231,887 | |

It is undisputed that these distributions constituted an inheritance received during marriage and were therefore, at least upon receipt, Peter's separate property.

{¶9}    Peter deposited these inheritance distributions into the checking account as they were received. Within a short period of time, Peter made corresponding transfers into the savings account. The amounts and dates of the transfers were as follows:

| Transfer amount | Transfer date |
|---|---|
| $18,500 | May 11, 2015 |
| $100,000 | December 4, 2015 |
| $101,000 | May 31, 2016 |
| Total:  $219,500 | |

The inheritance monies that were not transferred to savings were used on marital spending or were otherwise commingled and Peter does not argue that these funds are traceable separate assets.

{¶10}  This appeal is primarily concerned with whether the $219,500 inheritance funds that were transferred to the savings account were traceable *after* they were transferred to the savings account.

{¶11}  At some time after learning of the value of the inheritance, Peter, Becca, and Peter's parents met and planned what Peter should do with this newfound money. Peter

---

1. There was a fourth and final distribution from the trust for an insignificant amount, which the parties have disregarded for purposes of this dispute.

described the plan as follows:

> Counsel: What was – if you had a plan, what was your plan with that large sum of money?
>
> Peter: Um, I didn't expect that much. I knew I was getting $25,000, and I had no idea what the one-eighth was.[2] So when the one-eighth came to light in the amount that it did, um, I had some conversations with my parents and it was determined that I was going to use Ron [Luce] as, um –I guess Becca was there for the conversation, when everybody was—Ron [Luce] as our financial advisor to in- -invest a lot of this money for, you know, the future. For, you know, [our daughter's] future, for college, for whatever we needed down the road.

{¶12} Approximately ten months after receiving the third trust distribution, Peter and Becca opened a mutual fund account ("the mutual fund") with Luce & Associates. The mutual fund was held by both Peter and Becca, with a right of survivorship. Peter testified that Ron Luce presented the family with a plan for funding the mutual fund, which called for a total investment of $165,000. This would be accomplished through an initial payment of $45,000, followed by 24 subsequent $5,000 payments over the course of the next two years.

{¶13} Peter began carrying out this plan in March 2017. He first transferred $45,000 from the savings account to the checking account. He then initiated a $45,000 electronic funds transfer from the checking account to the mutual fund. Afterwards, following the same method of transferring funds from the savings account to the checking account, and then from the checking account to the mutual fund, Peter caused $5,000 to be transferred to the mutual fund each month for the next two years, with the final transfer occurring in March 2019. Consistent with the investment plan, the total amount invested in the mutual fund was $165,000.

---

2. The trust provided Peter with a specific bequest of $25,000 plus a one-eighth fraction of the remaining trust. Peter was explaining that he had no idea of the amount of money that would constitute the remaining one eighth.

{¶14} In January 2020 (the month before Peter filed for divorce), the mutual fund was changed from being jointly held by Peter and Becca with the right of survivorship to being held solely in Peter's name. Peter, who initiated the change, testified that Becca "agreed" to that change. Becca did not testify concerning her understanding of being removed as an owner of the mutual fund. She testified that Peter managed the mutual fund, and she was not a "good financial person."

{¶15} On cross-examination, Becca's counsel asked Peter what his intent was by opening the mutual fund as a joint account "up until you were planning on filing for divorce?" Peter responded, "I had planned on Becca and I living together and being married forever * * * So the things that you do for your wife."

{¶16} The parties stipulated that after market gains and losses, the value of the mutual fund at the stipulated termination date of the marriage was $177,672.05 (with the increase due to passive gains) and that the value of the savings account was $65,132.92.

{¶17} Peter testified that he believed that all the contributions to the mutual fund were his separate property because he claimed that the funding source was entirely his inheritance. He presented the court with a spreadsheet that purported to demonstrate tracing of the inheritance funds from checking to savings, from savings to checking, and from checking to the mutual fund.

{¶18} Peter further claimed that of the roughly $65,000 balance left in the savings account at the termination date of the marriage, at least $54,500 of that amount constituted his separate property. He arrived at this figure by subtracting the amount transferred to the mutual fund ($165,000) from the total inheritance monies that were deposited into savings ($219,500).

{¶19} During Peter's cross-examination, Becca's counsel exhaustively questioned Peter on numerous transfers of thousands of dollars from savings to checking that occurred

after the dates on which inheritance monies were deposited into the savings account, and before, during, and after the funding of the mutual fund. Through cross-examination, Becca's counsel suggested that given the amount of monies transferred out of the savings account, Peter's claim as to the amount of inherited monies remaining in the savings account was impossible.

{¶20} On re-direct, Peter modified his request for separate property from the savings account. He now claimed that the savings account held, at a "bare minimum," $28,500 of his inheritance/separate property. He arrived at this figure by taking the $219,500 transferred into the savings account, and then subtracting the following: $165,000 of funds transferred to the mutual fund, an approximate $10,000 payment used towards the marital home, and $16,750 he used to pay for a vehicle.[3] Peter clarified, however, that the $16,750 of inheritance monies he used to pay for the car was a "loan" to himself using his inheritance funds and that he should be compensated with marital assets for that expenditure. Thus, the actual bare minimum he was asking for out of the savings account was $44,500.

## B. Domestic Relations Court's Decision

{¶21} In its decision, the domestic relations court described the various accounts and transfers in detail. The court also noted that the spreadsheet that Peter submitted at the hearing purported to demonstrate the transfers to the mutual fund but failed to include the monthly bank account transactions.

{¶22} After explaining the applicable law, the domestic relations court set forth the following analysis:

> After receiving inheritance funds * * *, [Peter] and [Becca] jointly opened the mutual fund account managed by Luce and Associates and the account was held as Joint Tenancy With Right Of Survivorship. The mutual fund account was held jointly

_____

3. These amounts, combined, result in a "bare minimum" separate property figure of $27,750, not the $28,500 figure offered by Peter. The reason for this discrepancy is not apparent from the record.

and managed during the marriage. Just prior to filing the divorce, the mutual fund account was changed to [Peter's] individual account. During the marriage, the parties together contributed to the payment of household bills and other marital expenses primarily using the parties' [checking account] and [savings account]. [Peter] made numerous fund transfers between his accounts. Tracing of funds from [the savings account] to [the checking account] and from [the checking account] by EFT to the mutual fund were presented. In doing so, the inherited money was commingled with marital funds. [Peter] unilaterally transferred marital funds to the mutual fund to "pay back" funds he used from inheritance to cover marital expenditures. [Peter] held the burden to trace any separate property interest in the financial account.

The evidence is clear [Peter] converted his separate property interest to marital property. The action of placing separate property into a joint account transmuted separate property into marital property. The Court recognizes title to property held individually or by both spouses in a form of co-ownership does not alone determine whether the property is marital property or separate property. In the case at hand, any non-marital interest acquired by [Peter] by inheritance was so commingled with the marital component it cannot be traced with any certainty. [Peter] was not persuasive in his claim of identifying separate property. He failed to show he possesses a non-marital interest in the financial account(s).

{¶23} The court concluded that "[t]he financial accounts"—that is, the mutual fund and the savings account—were marital property.

{¶24} Peter appealed, raising three assignments of error, which we address out of the order presented.

## II. Law and Analysis

### A. Traceability of Peter's Alleged Separate Property

{¶25} Peter's Assignment of Error No. 2 states:

{¶26} THE TRIAL COURT ERRED IN FINDING THAT HUSBAND'S SEPARATE PROPERTY COULD NOT BE TRACED.

{¶27} Peter contends that he demonstrated a separate property interest in the mutual fund and the savings account and that the court erred in finding that he failed to

- 7 -

meet his burden of proof.[4]  Becca contends that the evidence at trial established Peter's failure to trace his separate property and specifically that the parties jointly contributed to marital spending accounts and that marital monies were so commingled with Peter's separate monies that there was no way for the court to determine Peter's separate property interest with any certainty.

### 1. Law of Property Division

{¶28}  Property division in a divorce proceeding is a two-step process that is subject to two different standards of review.  *Garcia v. Garcia Samano*, 12th Dist. Butler No. CA2018-05-094, 2019-Ohio-3223, ¶ 10, citing *Smith v. Smith*, 12th Dist. Clermont No. CA2016-08-059, 2017-Ohio-7463, ¶ 8.  First, the domestic relations court must determine "what constitutes marital property and what constitutes separate property."  R.C. 3105.171(B).  We review the classification of property or debt as marital or separate under the manifest-weight-of-the-evidence standard and will not reverse a domestic relations court's classification if it is supported by competent and credible evidence.  *Id.*; *Renz v. Renz*, 12th Dist. Clermont No. CA2010-05-034, 2011-Ohio-1634, ¶ 13.

{¶29}  Second, the domestic relations court then must equitably divide the marital property and separate property between the spouses in accordance with the provisions of R.C. 3105.171.  *Id.*  The domestic relations court has broad discretion to determine an equitable and fair division of the marital estate.  *Bauer v. Bauer*, 12th Dist. Warren Nos. CA2019-04-033 and CA2019-04-040, 2020-Ohio-425, ¶ 22, citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 355 (1981).  This court will not reverse a domestic relations court's decision

---

4. As discussed above, Peter claimed at trial that the mutual fund was entirely his separate property.  On appeal, Peter argues that, at a minimum, 72.5 percent of the mutual fund is his separate property.  He arrives at this percentage by considering the amount of marital funds that were added to the savings account at the time the mutual fund was being funded and presuming that all of those marital funds were used to fund the mutual fund.  That is, he argues, if all the potential marital funds that were added to savings during that time were used to fund the mutual fund, then such funds would account for 27.5 percent of the $165,000.

regarding the division of property in a divorce proceeding absent an abuse of discretion. *Id.* An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶30} "Marital property" is defined as "All real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage * * *." R.C. 3105.171(A)(3)(a)(i). "'Marital property' does not include any separate property." R.C. 3105.171(A)(3)(b). Separate property includes "An inheritance by one spouse by bequest, devise, or descent during the course of the marriage * * *." R.C. 3105.171(A)(6)(a)(i).

### 2. Law and Burden of Proof on Tracing Separate Property

{¶31} "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). "Property currently owned is traceable to separate property, commingling notwithstanding, if a sufficient connection is shown to exist between the two." *Fisher v. Fisher*, 2d Dist. Montgomery No. 20398, 2004-Ohio-7255, ¶ 17. Such a connection is shown when the proof offered overcomes the effect of commingling, by which separate property may be "transmuted" into marital property. *Tyra v. Tyra*, 1st Dist. Hamilton No. C-210392, 2022-Ohio-2504, ¶ 15, citing *Fiamengo v. Fiamengo*, 2d Dist. Montgomery No. 26704, 2016-Ohio-4720, ¶ 28.

{¶32} Tracing commingled assets is more complex when the commingled property is fungible. *Fisher* at ¶ 17. Both the passage of time and multiple conversions that may have taken place make tracing more difficult. *Id.* In this regard, we have held that "[s]eparate property can lose its nonmarital quality when it cannot be clearly traced because of extensive and repeated commingling." *Bauer*, 2020-Ohio-425 at ¶ 31.

{¶33} The party seeking to have a particular asset classified as separate property

has the burden of proof, by a preponderance of evidence, to trace the asset to separate property. *Peck v. Peck*, 96 Ohio App.3d 731, 734 (12th Dist.1994). Traceability presents a question of fact, and so a court of appeals must defer to the trial court's findings. *Tyra* at ¶ 15, citing *Fiamengo* at ¶ 29. We will not reverse a decision on tracing so long as it is supported by competent, credible evidence. *Id.*

### 3. Analysis of Savings Account

**{¶34}** The domestic relations court found that Peter commingled his separate inheritance funds with marital funds in the savings account to such a degree that tracing was no longer feasible.

**{¶35}** The relevant time period under consideration is from May 2015, when the first deposit of inheritance funds entered the savings account, through December 2019, which was the stipulated termination date of the marriage. The savings account bank statements in evidence began in May 2015 showing a balance of $1,691, which Peter agrees was marital. Then, the evidence showed that Peter transferred $219,500 of his inheritance funds to the savings account in three transactions in May 2015, December 2015, and May 2016. But these were not the only deposits into the savings account during the relevant time period. Between May 2015 and December 2019, nearly $85,000 was added to the savings account by way of more than 150 individual deposit transactions.[5] Many of these deposits were transfers from the checking account, but others were deposits that came from other sources. Whatever the source, Peter makes no argument that any of these deposits were his separate property, so we can safely assume that all these deposits totaling nearly $85,000 were marital funds.

**{¶36}** As explained above, Peter transferred $45,000 from the savings account to

---

5. The savings account also earned monthly interest deposits.

the checking account and then to the mutual fund in March 2017. Similarly, he transferred $5,000 from the savings account to the checking account and from there to the mutual fund each month from March 2017 to March 2019. These transfers out of the savings account totaled $165,000. But these transfers were not the only deductions from the savings account in the relevant time period. In fact, from March 2015 to December 2019, Peter moved more than $80,000 out of the savings account and into the checking account, in more than 20 transactions, *without* those funds being transferred to the mutual fund. It appears those funds were used for marital purposes. In any event, as previously stated, there is no dispute that the funds in the checking account were marital property, not Peter's separate property.

{¶37} The savings account transactions we have just described are set forth in more detail below:[6]

| Date | Balance | Inheritance Deposit | Other Deposit | Interest | Withdrawals /Transfers to Checking (then Mutual Fund) | Other Withdrawals /Transfers to Checking |
|------|---------|---------------------|---------------|----------|-------------------------------------------------------|------------------------------------------|
| 5/1/2015 | 1,690.76 | | | | | |
| 5/1/2015 | | | 50.00 | | | |
| 5/11/2015 | | 18,500.00 | | | | |
| 5/15/2015 | | | 50.00 | | | |
| 5/29/2015 | | | 50.00 | | | |
| 5/31/2015 | | | | 4.24 | | |
| 6/12/2015 | | | 50.00 | | | |

---

6. While the parties both provided charts to the domestic relations court and in connection with their appellate briefs, we find that the parties' charts do not provide the comprehensive overview of the available data necessary to analyze the trial court's decision. We therefore created the above chart to aid in our analysis. The chart is mostly based on the savings account bank statements in the record. However, the parties failed to include in the record the savings account bank statements for certain months in the relevant time period. For those months we considered transfers from Peter's checking account to the savings account to the extent those transfers are listed on checking account bank statements that are in the record. However, certain savings account transactions in those months—including monthly balances and interest deposits—are not available in the record and so those transactions are necessarily omitted from our chart. Nonetheless, the savings account and checking account statements included in the record contain more than sufficient information for us to reach the conclusions we reach in this opinion.

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 6/26/2015 | | | 50.00 | | | |
| 7/1/2015 | 20,450.80 | | | | | |
| 7/10/2015 | | | 50.00 | | | |
| 7/13/2015 | | | | | | -9,000.00 |
| 7/16/2015 | | | 4,000.00 | | | |
| 7/24/2015 | | | 50.00 | | | |
| 7/31/2015 | | | | 3.91 | | |
| 8/7/2015 | | | 150.00 | | | |
| 8/21/2015 | | | 150.00 | | | |
| 9/1/2015 | 15,858.32 | | | | | |
| 9/4/2015 | | | 150.00 | | | |
| 9/8/2015 | | | | | | -4,500.00 |
| 9/18/2015 | | | 150.00 | | | |
| 9/30/2015 | | | | 2.80 | | |
| 10/2/2015 | | | 150.00 | | | |
| 10/16/2015 | | | 150.00 | | | |
| 10/30/2015 | | | 150.00 | | | |
| 11/13/2015 | | | 150.00 | | | |
| 11/27/2015 | | | 150.00 | | | |
| 12/1/2015 | 12,416.88 | | | | | |
| 12/4/2015 | | 100,000.00 | | | | |
| 12/11/2015 | | | 150.00 | | | |
| 12/24/2015 | | | 150.00 | | | |
| 12/31/2015 | | | | 30.41 | | |
| 1/8/2016 | | | 150.00 | | | |
| 2/1/2016 | 113,080.67 | | | | | |
| 2/5/2016 | | | 150.00 | | | |
| 2/19/2016 | | | 150.00 | | | |
| 2/23/2016 | | | | | | -16,750.00 |
| 2/29/2016 | | | | 29.67 | | |
| 3/4/2016 | | | 150.00 | | | |
| 3/18/2016 | | | 150.00 | | | |
| 4/1/2016 | 96,986.59 | | | | | |
| 4/1/2016 | | | 150.00 | | | |
| 4/12/2016 | | | | | | -2,000.00 |
| 4/15/2016 | | | 150.00 | | | |
| 4/25/2016 | | | | | | -3,000.00 |
| 4/29/2016 | | | 150.00 | | | |
| 4/30/2016 | | | | 25.01 | | |
| 5/1/2016 | 92,461.60 | | | | | |
| 5/13/2016 | | | 150.00 | | | |
| 5/16/2016 | | | 1,824.16 | | | |
| 5/27/2016 | | | 150.00 | | | |
| 5/31/2016 | | 101,000.00 | | | | |
| 5/31/2016 | | | | 26.39 | | |
| 6/10/2016 | | | 150.00 | | | |
| 6/24/2016 | | | 150.00 | | | |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 7/8/2016 | | | 150.00 | | | |
| 7/22/2016 | | | 150.00 | | | |
| 8/1/2016 | 196,299.68 | | | | | |
| 8/5/2016 | | | 150.00 | | | |
| 8/16/2016 | | | | | | -2,000.00 |
| 8/19/2016 | | | 150.00 | | | |
| 8/31/2016 | | | | 1.66 | | |
| 9/2/2016 | | | 150.00 | | | |
| 9/16/2016 | | | 150.00 | | | |
| 9/30/2016 | | | 150.00 | | | |
| 10/14/2016 | | | 150.00 | | | |
| 10/28/2016 | | | 150.00 | | | |
| 11/10/2016 | | | 150.00 | | | |
| 11/25/2016 | | | 150.00 | | | |
| 12/9/2016 | | | 150.00 | | | |
| 12/23/2016 | | | 150.00 | | | |
| 1/6/2017 | | | 150.00 | | | |
| 1/20/2017 | | | 150.00 | | | |
| 2/3/2017 | | | 150.00 | | | |
| 2/17/2017 | | | 150.00 | | | |
| 3/1/2017 | 197,328.27 | | | | | |
| 3/3/2017 | | | 150.00 | | | |
| 3/6/2017 | | | | | -45,000.00 | |
| 3/17/2017 | | | 150.00 | | | |
| 3/31/2017 | | | 150.00 | | | |
| 3/31/2017 | | | | | -5,000.00 | |
| 3/31/2017 | | | | 94.64 | | |
| 4/1/2017 | 147,872.91 | | | | | |
| 4/11/2017 | | | | | | -2,500.00 |
| 4/14/2017 | | | 150.00 | | | |
| 4/28/2017 | | | 150.00 | | | |
| 4/30/2017 | | | | 83.93 | | |
| 5/1/2017 | 145,756.84 | | | | | |
| 5/1/2017 | | | | | -5,000.00 | |
| 5/12/2017 | | | 150.00 | | | |
| 5/26/2017 | | | 150.00 | | | |
| 5/31/2017 | | | | 83.52 | | |
| 6/1/2017 | 141,140.36 | | | | | |
| 6/1/2017 | | | | | -5,000.00 | |
| 6/9/2017 | | | 150.00 | | | |
| 6/23/2017 | | | 150.00 | | | |
| 6/30/2017 | | | | 78.10 | | |
| 6/30/2017 | | | | | -5,000.00 | |
| 7/7/2017 | | | 150.00 | | | |
| 7/21/2017 | | | 150.00 | | | |
| 8/1/2017 | 131,896.53 | | | | | |
| 8/1/2017 | | | | | -5,000.00 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 8/4/2017 | | | 150.00 | | | |
| 8/18/2017 | | | 150.00 | | | |
| 8/31/2017 | | | | 75.34 | | |
| 9/1/2017 | 127,271.87 | | | | -5,000.00 | |
| 9/1/2017 | | | 150.00 | | | |
| 9/15/2017 | | | 150.00 | | | |
| 9/29/2017 | | | 150.00 | | | |
| 9/29/2017 | | | | | -5,000.00 | |
| 9/30/2017 | | | | 85.06 | | |
| 10/13/2017 | | | 150.00 | | | |
| 10/27/2017 | | | 150.00 | | | |
| 11/1/2017 | 118,191.76 | | | | | |
| 11/1/2017 | | | | | -5,000.00 | |
| 11/10/2017 | | | 150.00 | | | |
| 11/17/2017 | | | | | | -1,340.00 |
| 11/24/2017 | | | 150.00 | | | |
| 11/30/2017 | | | | 78.46 | | |
| 12/1/2017 | 112,230.22 | | | | | |
| 12/1/2017 | | | | | -5,000.00 | |
| 12/8/2017 | | | 150.00 | | | |
| 12/15/2017 | | | 3,026.15 | | | |
| 12/15/2017 | | | | | | -2,000.00 |
| 12/22/2017 | | | 150.00 | | | |
| 12/29/2017 | | | | | -5,000.00 | |
| 12/31/2017 | | | | 77.11 | | |
| 1/1/2018 | 103,633.48 | | | | | |
| 1/5/2018 | | | 150.00 | | | |
| 1/16/2018 | | | | | | -1,000.00 |
| 1/19/2018 | | | 150.00 | | | |
| 1/31/2018 | | | | 0.88 | | |
| 2/1/2018 | 102,934.36 | | | | | |
| 2/1/2018 | | | | | -5,000.00 | |
| 2/2/2018 | | | 150.00 | | | |
| 2/7/2018 | | | 350.00 | | | |
| 2/16/2018 | | | 150.00 | | | |
| 2/20/2018 | | | | | | -1,000.00 |
| 2/28/2018 | | | | 0.75 | | |
| 3/1/2018 | 97,585.11 | | | | | |
| 3/1/2018 | | | | | -5,000.00 | |
| 3/2/2018 | | | 150.00 | | | |
| 3/16/2018 | | | 150.00 | | | |
| 3/30/2018 | | | | | -5,000.00 | |
| 3/30/2018 | | | 150.00 | | | |
| 3/31/2018 | | | | 74.32 | | |
| 4/13/2018 | | | 150.00 | | | |
| 4/27/2018 | | | 150.00 | | | |
| 5/1/2018 | 89,533.26 | | | | | |

| Date | | | | | |
|---|---|---|---|---|---|
| 5/1/2018 | | | | -5,000.00 | |
| 5/11/2018 | | 150.00 | | | |
| 5/18/2018 | | 100.00 | | | |
| 5/18/2018 | | 50.00 | | | |
| 5/25/2018 | | 150.00 | | | |
| 5/31/2018 | | | 83.80 | | |
| 6/1/2018 | 85,067.06 | | | | |
| 6/1/2018 | | | | -5,000.00 | |
| 6/6/2018 | | 215.00 | | | |
| 6/7/2018 | | 350.00 | | | |
| 6/8/2018 | | 150.00 | | | |
| 6/22/2018 | | 150.00 | | | |
| 6/27/2018 | | 701.32 | | | |
| 6/29/2018 | | | | -5,000.00 | |
| 6/30/2018 | | | 0.66 | | |
| 7/1/2018 | 76,634.04 | | | | |
| 7/2/2018 | | 5,000.00 | | | |
| 7/6/2018 | | 150.00 | | | |
| 7/19/2018 | | | | | -1,500.00 |
| 7/20/2018 | | 150.00 | | | |
| 7/31/2018 | | | 88.92 | | |
| 8/1/2018 | 80,522.96 | | | | |
| 8/1/2018 | | | | -5,000.00 | |
| 8/3/2018 | | 150.00 | | | |
| 8/6/2018 | | 350.00 | | | |
| 8/15/2018 | | | | | -500.00 |
| 8/17/2018 | | 150.00 | | | |
| 8/31/2018 | | | | -5,000.00 | |
| 8/31/2018 | | 150.00 | | | |
| 8/31/2018 | | | 95.65 | | |
| 9/1/2018 | 70,918.61 | | | | |
| 9/10/2018 | | 4,500.00 | | | |
| 9/14/2018 | | 150.00 | | | |
| 9/17/2018 | | | | | -2,500.00 |
| 9/28/2018 | | 150.00 | | | |
| 9/30/2018 | | | 89.41 | | |
| 10/1/2018 | 73,308.02 | | | | |
| 10/1/2018 | | | | -5,000.00 | |
| 10/12/2018 | | 150.00 | | | |
| 10/15/2018 | | | | | -3,000.00 |
| 10/26/2018 | | 150.00 | | | |
| 10/31/2018 | | | 86.28 | | |
| 11/1/2018 | 65,694.30 | | | | |
| 11/1/2018 | | | | -5,000.00 | |
| 11/9/2018 | | 150.00 | | | |
| 11/16/2018 | | | | | -2,000.00 |
| 11/23/2018 | | 150.00 | | | |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 11/30/2018 | | | | | -5,000.00 | |
| 11/30/2018 | | | | 79.63 | | |
| 12/1/2018 | 54,073.93 | | | | | |
| 12/4/2018 | | | 13,000.00 | | | |
| 12/4/2018 | | | 94.64 | | | |
| 12/7/2018 | | | 150.00 | | | |
| 12/7/2018 | | | 357.00 | | | |
| 12/7/2018 | | | 350.00 | | | |
| 12/12/2018 | | | 2,103.98 | | | |
| 12/21/2018 | | | 150.00 | | | |
| 12/28/2018 | | | 8,100.00 | | | |
| 12/31/2018 | | | | | -5,000.00 | |
| 12/31/2018 | | | | 97.43 | | |
| 1/1/2019 | 73,476.98 | | | | | |
| 1/2/2019 | | | 43.94 | | | |
| 1/4/2019 | | | 150.00 | | | |
| 1/7/2019 | | | 350.00 | | | |
| 1/9/2019 | | | 270.28 | | | |
| 1/18/2019 | | | 150.00 | | | |
| 1/31/2019 | | | | 106.30 | | |
| 2/1/2019 | 74,547.50 | | | | | |
| 2/1/2019 | | | 150.00 | | | |
| 2/1/2019 | | | | | -5,000.00 | |
| 2/11/2019 | | | 350.00 | | | |
| 2/12/2019 | | | 587.00 | | | |
| 2/15/2019 | | | 150.00 | | | |
| 2/28/2019 | | | | 91.03 | | |
| 3/1/2019 | 70,875.53 | | | | | |
| 3/1/2019 | | | 150.00 | | | |
| 3/1/2019 | | | | | -5,000.00 | |
| 3/11/2019 | | | 3,436.80 | | | |
| 3/15/2019 | | | 150.00 | | | |
| 3/29/2019 | | | 150.00 | | | |
| 3/31/2019 | | | | 98.07 | | |
| 4/1/2019 | 69,860.40 | | | | | |
| 4/11/2019 | | | 350.00 | | | |
| 4/12/2019 | | | 150.00 | | | |
| 4/26/2019 | | | 150.00 | | | |
| 4/30/2019 | | | | 97.35 | | |
| 5/1/2019 | 70,607.75 | | | | | |
| 5/2/2019 | | | | | | -2,000.00 |
| 5/9/2019 | | | 3,500.00 | | | |
| 5/9/2019 | | | 350.00 | | | |
| 5/10/2019 | | | 150.00 | | | |
| 5/16/2019 | | | | | | -2,500.00 |
| 5/24/2019 | | | 150.00 | | | |
| 5/30/2019 | | | | 100.67 | | |

| | | | | | |
|---|---|---|---|---|---|
| 6/1/2019 | 70,358.42 | | | | |
| 6/7/2019 | | | 150.00 | | |
| 6/17/2019 | | | | | -3,000.00 |
| 6/21/2019 | | | 150.00 | | |
| 6/30/2019 | | | | 95.85 | |
| 7/1/2019 | 67,754.27 | | | | |
| 7/5/2019 | | | 150.00 | | |
| 7/8/2019 | | | 350.00 | | |
| 7/19/2019 | | | 150.00 | | |
| 7/31/2019 | | | | 0.58 | |
| 8/1/2019 | 68,404.85 | | | | |
| 8/2/2019 | | | 150.00 | | |
| 8/12/2019 | | | 350.00 | | |
| 8/14/2019 | | | 77.20 | | |
| 8/16/2019 | | | 150.00 | | |
| 8/30/2019 | | | 150.00 | | |
| 8/31/2019 | | | | 90.35 | |
| 9/1/2019 | 69,372.40 | | | | |
| 9/13/2019 | | | 150.00 | | |
| 9/16/2019 | | | | | -5,000.00 |
| 9/27/2019 | | | 150.00 | | |
| 9/30/2019 | | | | 76.91 | |
| 10/1/2019 | 64,749.31 | | | | |
| 10/10/2019 | | | | | -5,000.00 |
| 10/10/2019 | | | 6,500.00 | | |
| 10/11/2019 | | | 150.00 | | |
| 10/11/2019 | | | 350.00 | | |
| 10/15/2019 | | | 1,177.03 | | |
| 10/25/2019 | | | 150.00 | | |
| 10/31/2019 | | | | 70.26 | |
| 11/1/2019 | 68,146.60 | | | | |
| 11/8/2019 | | | 150.00 | | |
| 11/8/2019 | | | 387.00 | | |
| 11/12/2019 | | | 350.00 | | |
| 11/18/2019 | | | | | -7,000.00 |
| 11/22/2019 | | | 150.00 | | |
| 11/30/2019 | | | | 67.17 | |
| 12/1/2019 | 62,250.77 | | | | |
| 12/6/2019 | | | 150.00 | | |
| 12/13/2019 | | | 4,081.61 | | |
| 12/16/2019 | | | | | -1,500.00 |
| 12/20/2019 | | | 150.00 | | |
| 12/31/2019 | | | | 0.54 | |
| | | 219,500.00 | 84,783.11 | 2,373.06 | -165,000.00 | -80,590.00 |

**{¶38}** The evidence of extensive and repeated commingling of separate and marital funds in the savings account during the relevant time period is apparent in the above chart. This commingling supports the domestic relations court's decision that Peter failed to meet his burden of tracing separate funds. *Bauer*, 2020-Ohio-425 at ¶ 31. Given near continuous transfers of separate and marital monies in and out of the savings account and the lengthy passage of time, Peter failed to offer evidence that would overcome the effect of commingling and substantiate a decision tracing his separate assets in the savings account. *Tyra*, 2022-Ohio-2504 at ¶ 15; *Fisher*, 2004-Ohio-7255 at ¶ 16.

**{¶39}** In *Freytag v. Freytag*, 12th Dist. Butler No. CA93-11-223, 1994 WL 424135, (Aug. 15, 1994), this court reversed a domestic relations court's decision awarding a party a separate property inheritance of monies that was received years earlier and commingled with marital assets. We noted that "it is arbitrary to declare an inheritance as separate property when a portion of that inheritance has been consistently shuffled between down payments on marital residences and household and family expenses." *Id.* at *3. The same is essentially the case here. Given the evidence presented, it would be arbitrary for the domestic relations court to determine what percentage of any single transfer of funds that occurred throughout the four-year period could be said to be separate property versus marital property. Likewise, it would be unreasonable for any court to determine with any reasonable accuracy what percentage of separate funds, if any, remained in savings by the end of 2019.

**{¶40}** An example will be helpful. Look at the transfers in the savings account from May 2015 through July 2015. When Peter transferred $18,500 of his inheritance funds into the savings account on May 11, 2015, the amount of funds already in the savings account was only $1,740.76 (that is, the $1,690.76 original balance plus one deposit of $50), all marital funds. Five deposits of $50 each, for a total of $250, were added to the account

between May 11, 2015 and July 10, 2015. These five deposits were marital funds. As a result, when Peter transferred $9,000 from the savings account to the checking account on July 13, 2015, *at least* $7,259.24 of that amount must have been inheritance funds ($9,000 – $1,740.76 = $7,259.24). Therefore, a large portion of the first inheritance fund transfer of $18,500 was necessarily used for marital purposes (as part of the $9,000 transfer to checking) and was unavailable for transfer to the checking account and then to the mutual fund when the first such transfer was made nearly two years later. Nor could those funds have remained in the savings account as Peter's separate property because they were actually paid out as part of the $9,000 transfer to checking.

{¶41} Numerous other such examples can be constructed based on the savings account records. Simply put, Peter's inheritance funds were commingled with marital funds in the savings account in such a way that it is impossible to determine with any certainty what portions of those funds were ultimately transferred to the mutual fund, transferred to the checking account, or remained in the savings account.

{¶42} The parties presented the trial court with evidence of extensive and repeated commingling of Peter's inheritance over the course of four years. The extensive commingling caused the inheritance to lose its separate property character. As such, competent and credible evidence supported the domestic relations court's decision to characterize the funds in the savings account as a marital asset. We find no error in the domestic relations court's decision regarding the savings account.

### 4. Analysis of the Mutual Fund

{¶43} For the same reasons that Peter's inheritance funds in the savings account are not traceable, we also find the domestic relations court did not abuse its discretion in determining that the inheritance funds were not traceable to the mutual fund. As explained above, it is not possible to determine what portion of the $165,000 that was ultimately

transferred to the mutual fund was derived from Peter's original inheritance funds. Inheritance funds that were commingled with marital funds in the savings account did not suddenly become traceable because Peter and Becca (long after Peter received the inheritance and transferred it to the savings account) decided to transfer $165,000 to the mutual fund. Nor did the commingled inheritance funds become traceable simply because funds were transferred from the savings account in a predictable and orderly manner. This is the case because there were numerous deposits of presumed marital funds into the savings account and numerous transfers of monies out of the savings account to the checking account which may have been transfers of inheritance monies even before the first $45,000 transfer to the mutual fund.

{¶44} For this reason, we find that competent and credible evidence supported the domestic relations court's decision to characterize the funds in the mutual fund as a marital asset. The domestic relations court did not abuse its discretion in this respect. We find no error in the domestic relations court's decision with regard to the mutual fund.

{¶45} In addition, we note that even if some or all of the funds that ultimately made their way to the mutual fund were traceable from the original inheritance funds, Peter's own testimony establishes that he made an inter vivos gift of those funds to Becca.

{¶46} "'[S]pouses can change separate property to marital property based on actions during the marriage.'" *Helton v. Helton*, 114 Ohio App.3d 683, 685 (2d Dist.1996), quoting *Moore v. Moore*, 83 Ohio App.3d 75, 77 (9th Dist.1992). The most common method of effecting this change is through the gratuitous transfer of property from the donor spouse to the donee spouse, i.e., through an inter vivos gift. *Golick v. Golick*, 12th Dist. Clermont No. CA99-05-040, 2001 WL 1598290, *6 (Dec. 17, 2001). The elements of an inter vivos gift are "(1) an intention on the part of the donor to transfer the title and right of possession of the particular property to the donee then and there, and (2) in pursuance of such intention,

a delivery by the donor to the donee of the subject-matter of the gift to the extent practicable or possible, considering its nature, with relinquishment of ownership, dominion, and control over it." *Bolles v. Toledo Trust Co.*, 132 Ohio St. 21 (1936), paragraph one of the syllabus.

{¶47} The donee of a gift has the burden of showing that the donor intended an inter vivos gift by clear and convincing evidence. *Id.* at paragraph two of the syllabus. "Clear and convincing evidence" means that degree of proof that will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Golick* at *5, citing *Barkley v. Barkley*, 119 Ohio App.3d 155, 168-169 (4th Dist.1997).

{¶48} The evidence submitted at the hearing indicated that Peter and Becca opened the mutual fund account jointly, with a right of survivorship. As noted by the domestic relations court, this form of co-ownership, alone, was not outcome determinative as to whether Peter's inheritance lost its separate quality. R.C. 3105.171(A)(6)(b). However, the opening of the joint account is some competent evidence that would indicate Peter's intention to make a donative transfer of monies as well as delivery to and receipt by Becca.

{¶49} Peter testified that Becca was a participant in the family conversations that led to the opening of the mutual fund and the plan to invest $165,000—a plan that was made possible by Peter's receipt of his inheritance. When asked what he planned to do with a portion of his inheritance, Peter explained that the intention was to invest it for the future of the family, "For, you know, [our daughter's] future, for college, for *whatever we needed* down the road." Peter's words are further evidence of a gratuitous, donative intent to convert his separate inheritance monies to marital property.

{¶50} Peter further candidly explained his reasoning for the mutual fund being held jointly. He explained, "I had planned on Becca and I living together and being married forever * * * So the things that you do for your wife." In other words, there is clear and convincing evidence supporting the conclusion that at the time that he was funding the

mutual fund, Peter's intention was to gratuitously share his inheritance with his wife through a jointly-owned investment account.

{¶51} Many gifts are made for reasons that sour with the passage of time, but the law does not allow a donor to recover or revoke a valid inter vivos gift simply because those reasons have soured. *Dayal v. Lakshmipathy*, 6th Dist. Wood No. WD-19-049, 2020-Ohio-5441, ¶ 37, citing *Cooper v. Smith*, 155 Ohio App.3d 218, 2003-Ohio-6083, ¶ 25 (4th Dist.). In this regard, the pre-divorce removal of Becca as a title owner of the mutual fund appears to underscore Peter's recognition of the gift as well as his attempt to revoke his prior gratuitous transfer. Peter claimed that Becca "agreed" to her removal, but Becca only indicated that she understood the account to be a joint account until the divorce began, and that Peter was in charge of the mutual fund.

{¶52} The domestic relations court did not specifically state that it found a gift and did not state the extent to which the court may have considered Peter's testimony regarding his donative intent. The domestic relations court stated more generally that it found clear evidence of "conversion" of separate property into marital property.

{¶53} The court explained that "any non-marital interest acquired by [Peter] by inheritance was so commingled with the marital component it cannot be traced with any certainty." (We agree, as set forth above.) The court did not specifically describe the specific transactions that it concluded made the inheritance funds untraceable, but the record certainly demonstrates that there were numerous transactions involving the checking and savings accounts. While Peter offers a theory of how his inheritance funds could be traced into the mutual fund, his burden was not simply to offer a credible theory; he was required to convince the domestic relations court that the funds were traceable, and he failed to do so. While Peter's theory appears, on its face, to show an orderly process transferring separate inheritance monies to the mutual fund, this theory is based on the

unsupportable assumption that all of the transferred funds were inheritance funds and requires that other savings account transactions be ignored. The domestic relations court did not err in rejecting Peter's theory.

{¶54} For those reasons, we find competent and credible evidence supported the domestic relations court's decision that Peter converted his separate property interest in the inheritance funds transferred to the mutual fund account to a marital property interest. The domestic relations court did not err in holding that the funds in the mutual fund were marital property.

{¶55} We overrule Peter's Assignment of Error No. 2.[7]

### B. Domestic Relations Court's Use of "Transmuted" Term

{¶56} Peter's Assignment of Error No. 1 states:

{¶57} THE TRIAL COURT ERRED IN HOLDING THAT HUSBAND "TRANSMUTED" SEPARATE POPERTY INTO MARITAL PROPERTY BY PLACING PROPERTY IN A JOINT ACCOUNT

{¶58} Peter argues that the domestic relations court erred by stating in its decision that Peter "transmuted" his separate property into marital property by placing it in the jointly-owned mutual fund account. Peter argues that the fact that his inheritance was deposited into a jointly-held account was not outcome determinative and the court's reference to the concept of transmutation indicates the court applied an inapplicable and outdated legal concept.

{¶59} In response to Assignment of Error No. 2, we found that competent and credible evidence supported the domestic relations court's decision regarding Peter's

---

7. Peter did not specifically challenge the domestic relations court's division of the marital property. To the extent Peter challenges that decision, we find that the court did not abuse its discretion in granting the parties an equal distribution of marital property.

conversion of his inheritance from separate property to marital property in the savings account and the mutual fund. We observed that the domestic relations court did not merely rely on Peter's placement of the funds in the jointly held mutual fund account but instead found clear evidence that he converted those funds. Accordingly, Peter's argument is meritless.

{¶60} We overrule Peter's Assignment of Error No. 1.

### C. Proposed Reasonable Presumptions

{¶61} Peter's Assignment of Error No. 3 states:

{¶62} THE TRIAL COURT FAILED TO EMPLOY REASONABLE PRESUMPTIONS IN DISCHARGING ITS DUTY TO DETERMINE WHICH FUNDS ARE SEPARATE FUNDS AND WHICH FUNDS ARE MARITAL FUNDS.

{¶63} Peter contends that the domestic relations court should have used "various presumptions" to assist it in "the sorting of marital and separate property." Peter proposes a variety of different accounting methods that he suggests would assist a court in tracing separate property when presented with a situation like this, where separate funds have been extensively commingled with marital property funds.

{¶64} For instance, Peter suggests that a domestic relations court should presume that when marital funds are added to an account containing separate funds, and that when funds are later transferred out of that account to a marital account, then it should be presumed that marital funds were transferred first. He also proposes a variation of the same rule, which would differ from the first rule in that it would be presumed that the funds transferred back are "first separate funds." Finally, he suggests a "pro-rata" rule where any transfers out of a commingled account are deemed to be a pro rata blend of marital and separate funds.

{¶65} Peter cites no legal authority, case law, or statute that would authorize the

judicial creation of accounting presumptions when reviewing evidence and deciding cases related to the classification of separate and marital property. We decline to accept Peter's offer to craft such presumptions. We also note that if assets have been so extensively commingled that a party cannot meet their burden to trace their separate property, then the law already establishes that the assets have lost their separate quality during the marriage and should be found to be marital property.

{¶66} We overrule Peter's Assignment of Error No. 3.

### III. Conclusion

{¶67} Competent and credible evidence supported the domestic relations court's decision to classify the savings account and mutual fund as marital property.

{¶68} Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.